# NO. 14-12865

---

In the

# UNITED STATES COURT OF APPEALS

for the

# ELEVENTH CIRCUIT

---

Barbara Ann Kelly, Gregory Brian Myers

*Appellants,*

vs.

Regions Bank,

*Appellee.*

---

On Appeal from the United States District Court
for the Northern District Of Florida

---

# APPELLEE REGIONS BANK'S ANSWER BRIEF

---

PETER P. HARGITAI                     KEVIN W. COX
Florida Bar No. 85375                 Florida Bar No. 34020
E-Mail: peter.hargitai@hklaw.com      E-Mail: kevin.cox@hklaw.com
HOLLAND & KNIGHT LLP                  HOLLAND & KNIGHT LLP
50 North Laura Street, Suite 3900     315 South Calhoun Street, Suite 600
Jacksonville, Florida 32202           Tallahassee, Florida 32301
904-353-2000                          850-224-7000

Attorneys for Appellee Regions Bank

Case No. 14-12865
*Barbara Kelly, et al. v. Regions Bank*

## CERTIFICATE OF INTERESTED PERSONS
### and
## CORPORATE DISCLOSURE STATEMENT

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Local Rule 26.1-1, undersigned counsel for Regions Bank ("Regions" or "Regions Bank") hereby states that Regions Bank is a wholly-owned subsidiary of its parent, Regions Financial Corporation, which is traded on the NYSE under the symbol "RF", and that no public company owns ten percent or more of the stock in Regions Financial Corporation.

Undersigned counsel further certifies that the following persons and entities have an interest in the outcome of this case:

Cox, Kevin Willoughby

Crew & Crew P.A.

Crew, Jill W.

Crew, Michael H.

Fogleman, Christopher Curtis

Gleason, Flynn, Emig & Fogleman, Chtd.

Hargitai, Peter P.

Holland & Knight LLP

Kelly, Barbara Ann

C1 of 2

Case No. 14-12865
*Barbara Kelly, et al. v. Regions Bank*

Lynch, Timothy Cronin

Morreale, Frank Edward

Myers, Gregory Brian

Offit Kurman, P.A.

Regensdorf, Paul R.

Regions Bank

Regions Financial Corporation ("RF")

Rodgers, M. Casey (Hon.)

VerStandig, Maurice Belmont

## STATEMENT REGARDING ORAL ARGUMENT

Appellee Regions Bank does not believe that oral argument is necessary or warranted in this appeal.  The case is a rather standard summary judgment in which sophisticated investors who suffered asset depreciation and cash-flow problems in the recent recession have failed to maintain their financial obligations and have had judgments entered against them in litigation against lenders.  There are no unique or extraordinary issues that implicate the need for the further investment of legal or judicial time in preparing for oral argument.

But oral argument can also be of great help if the Court has particular problems with a routine issue or with the factual record.  If that turns out to be the case, counsel for Regions stands ready and willing to participate in any oral argument scheduled by this Court.

## <u>TABLE OF CONTENTS</u>

**Page**

CERTIFICATE OF INTERESTED PERSONS ....................................................C1

CORPORATE DISCLOSURE STATEMENT ....................................................C1

STATEMENT REGARDING ORAL ARGUMENT ..............................................i

TABLE OF AUTHORITIES ....................................................................v

STATEMENT REGARDING ADOPTION OF BRIEFS ......................................ix

STATEMENT OF THE ISSUES....................................................................1

STATEMENT OF THE CASE....................................................................3

    Nature of the Case ..........................................................................3

    Course of Proceedings and Dispositions in the Court Below .........................5

    Statement of the Facts.......................................................................6

       1.    Introduction to Facts..........................................................6

       2.    The Appellants Were Sophisticated Real Estate and Finance Professionals Who Invested in Numerous Florida Properties Using Multiple Lenders....................................................6

       3.    Regions Accommodated Appellants in 2007 When the Real Estate Bubble Burst....................................................10

       4.    Regions Accommodated Appellants in 2008 When Appellants' Faced What Regions Was Told Was a Short-Term Liquidity Problem.......................................................................10

       5.    Regions Became Insecure in 2009 Based on Information That Appellants' Ability to Repay Their Loans Was Impaired Long-Term ......................................................................12

       6.    Regions Attempted to Reach a Long-Term Solution With Appellants....................................................................13

       7.    Appellants Filed This Lawsuit Alleging That Regions' Suspension of Payments to Itself for Three Months Caused Them Extraordinary Damages ................................................14

    Standards of Review.......................................................................15

SUMMARY OF THE ARGUMENT ...........................................................17

ARGUMENT AND CITATIONS OF AUTHORITIES .........................................20

A.    Regions was indisputably insecure..................................................20

1.    There was substantial undisputed evidence in the record for the
court to find no genuine issue of material fact regarding
Regions' ability to act based on "insecurity".....................................20

(a)    The operation of the insecurity provision ................................20

(b)    The law does not require that a lender use the talismanic
term "insecure" when it determines a borrower's payment
likelihood is impaired ............................................................21

(c)    There is voluminous evidence in the record that Regions
was "insecure" because it believed in good faith that the
prospect of payment or performance was impaired.................23

2.    Appellants' assertion that "Bloetscher actually testified that
Regions, in fact, was not insecure," completely distorts the
record.....................................................................................30

3.    Regions was within its rights under the Promissory Note .................31

B.    The trial court did not err in its interpretation of the Promissory Note and
the Escrow Agreement...................................................................32

1.    This "Integration" Argument Was Not Preserved ....................33

2.    The Lower Court Correctly Applied the Terms of the
Escrow Agreement ....................................................33

C.    There was no genuine dispute of material fact that Regions owed no
fiduciary duty to Appellants ..........................................................36

1.    The circumstances needed to establish a fiduciary duty under
Florida law were not satisfied .........................................................37

(a)    Escrow Agreement did not trigger any fiduciary duty ............38

(b)    The nature of the banking relationship between Appellants
and Regions did not trigger a fiduciary duty ...........................39

(c)    Particular arguments by Appellants regarding allegedly
disputed facts.......................................................................43

(i)    Appellants had the opportunity to obtain an appraisal ...43

(ii)    Appellants initiated the idea of the cash-out refinance ..44

(d)    Appellants' arguments that a fiduciary duty applied to
Regions through "investment advisor" regulations which

explicitly exclude banks, or for administering the escrow account, must also fail................................................................46

D.  The court did not err in finding no genuine issue of material fact regarding the Appellant's FCCPA claim ....................................47

    1.  There was no genuine issue of material fact regarding the purpose of the debt...................................................................47

    2.  The court's ruling on the FCCPA must also be affirmed because the only alleged communication took place outside of Florida and was not covered by Florida law and any credit reporting communications were preempted by the FCRA ...................................................................................50

E.  The court did not err in awarding Regions its attorneys' fees incurred in recovering on its counterclaim........................................51

CONCLUSION...................................................................................................55

CERTIFICATE OF COMPLIANCE....................................................................56

CERTIFICATE OF FILING AND SERVICE .....................................................57

iv

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Federal Cases**

*Acciard v. Whitney*,
  No. 2:07–cv–476–UA–DNF, 2008 WL 5120898 (M.D. Fla. 2008) .................49

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986) ....................................16

*Arris Group, Inc. v. British Telecommc'ns PLC*,
  639 F.3d 1368 (11th Cir. 2011) .......................................................................22

*Clark v. Hous. Auth. of Alma*,
  971 F.2d 723 (11th Cir. 1992) ...................................................................17, 53

*Davidson v. Capital One, N.A.*,
  No. 14–20478–CIV, 2014 WL 3767677 (S.D. Fla. 2014) ................................51

*Davis v. Locke*,
  936 F.2d 1208 (11th Cir. 1991) .......................................................................53

*Decatur Ventures, LLC v. Daniel*,
  485 F.3d 387 (7th Cir. 2007) ...........................................................................43

*Giddens v. Equitable Life Assur. Soc. of U.S.*,
  445 F.3d 1286 (11th Cir. 2006) .......................................................................22

*Kernel Records Oy v. Mosley*,
  694 F.3d 1294 (11th Cir. 2012), *cert. denied*, — U.S. —, 133 S.Ct.
  1810, 185 L.Ed.2d 812 (2013).........................................................................50

*Lanz v. Resolution Trust Corp.*,
  764 F.Supp. 176 (S.D. Fla. 1991).....................................................................37

*Mahdavieh v. Suntrust Mortgage, Inc.*,
  13-32801-CIV, 2014 WL 1365425 (S. D. Fla. Apr. 17, 2014) .........................38

*Mastro v. Seminole Tribe of Florida*,
    No. 2:12–cv–411–FtM–38UAM, 2013 WL 3350567 (M.D. Fla.
    July 2, 2013)....................................................................................23

*Michael Linet, Inc. v. Village of Wellington, Fla.*,
    408 F.3d 757 (11th Cir. 2005) .......................................16, 33, 45, 46

*Oppenheim v. I.C. Sys., Inc.*,
    627 F.3d 833 (11th Cir. 2010) ..........................................................48

*U.S. ex rel. Ragghianti Founds. III, LLC v. Peter R. Brown Const.,*
    *Inc.*,
    No. 8:12–cv–942–T–33MAP, 2014 WL 4791999 (M.D. Fla. Sept.
    19, 2014) ..........................................................................................22

*Samadi v. Bank of Am., N.A.*,
    No. CV 109–02, 2010 WL 3894448 (S.D. Ga. Sept. 30, 2010),
    *aff'd*, 476 F. App'x. 819 (11th Cir. 2012) .........................................49

*Shuford v. Fidelity Nat. Property & Cas. Ins. Co.*,
    508 F.3d 1337 (11th Cir. 2007) .......................................................16

*Shumate v. Selma City Bd. of Educ.*,
    No. 13-14948, 2014 WL 4233265 (11th Cir. 2014).........................33

*Vega v. Invsco Group, Ltd.*,
    432 Fed. App'x. 867 (11th Cir. 2011) ..............................................16

*Walker v. Darby*,
    911 F.2d 1573 (11th Cir. 1990) .......................................................16

*Weitz Co., LLC v. Transp. Ins. Co.*,
    No. 08-23183-CIV, 2009 WL 5064118 (S.D. Fla. Dec. 16, 2009) ....................53

## State Cases

*Assad v. Mendell*,
    511 So. 2d 682 (Fla. 3d DCA 1987)..................................................44

*Baker v. Falcon Power, Inc.*,
    788 So. 2d 1104 (Fla. 5th DCA 2001)...............................................53

*Barnett Bank of W. Fla. v. Hooper*,
498 So. 2d 923 (Fla. 1986) .................................................................38

*Capital Bank v. MVB, Inc.*,
644 So. 2d 515 (Fla. 3d DCA 1994), *rev. denied*, 654 So. 2d 918
(1995) .................................................................................................37

*Caplan v. 1616 East Sunrise Motors, Inc.*,
522 So. 2d 920 (Fla. 3d DCA 1988) ..................................................53

*Ford Motor Credit Co. v. Sheehan*,
373 So. 2d 956 (Fla. 1st DCA 1979) ..................................................51

*Gurley v. Bank of Huntsville*,
349 So. 2d 43 (Ala. 1977) ..................................................................34

*Heindel v. Southside Chrysler-Plymouth, Inc.*,
476 So. 2d 266 (Fla. 1st DCA 1985) ..................................................53

*LaFerney v. Scott Smith Oldsmobile, Inc.*,
410 So. 2d 534 (Fla. 5th DCA 1982)..................................................53

*Lasco Enters., Inc. v. Kohlbrand*,
819 So. 2d 821 (Fla. 5th DCA 2002)..................................................32

*Pirretti v. Dean Witter Reynolds, Inc.*,
578 So. 2d 474 (Fla. 4th DCA 1991)..................................................53

*Quest v. Barnett Bank*,
397 So. 2d 1020 (Fla. 1st DCA 1981) ..........................................21, 30

*Regency Homes of Dade, Inc. v. McMillen*,
689 So. 2d 1204 (Fla. 3d DCA 1997)................................................53

*Rug Mart, Inc. v. Pellicci*,
384 So. 2d 1325 (Fla. 2d DCA 1980)................................................32

*SO5 501, LLC v. Metro-Dade Title Co.*,
109 So. 3d 1192 (Fla. 3d DCA 2013)............................................38, 39

*State Farm Fire & Casualty Co. v. Becraft*,
501 So. 2d 1316 (Fla. 4th DCA 1986)...............................................53

vii

*Taylor Woodrow Homes Fla., Inc., v. 4/46-A Corp.*,
 850 So. 2d 536 (Fla. 5th DCA 2003)..................................................................37

*Watkins v. NCNB Nat'l Bank of Fla., N.A.*,
 622 So. 2d 1063 (Fla. 3d DCA 1993), *rev. denied*, 634 So. 2d 629
 (1994).................................................................................................................37, 38

**Federal Statutes**

15 U.S.C. § 80b-2(a)(11)(A)....................................................................................46

**State Statutes**

§ 671.208, Fla. Stat. .........................................................................................21, 22

§ 559.72, Fla. Stat. (Florida Consumer Collections Practices Act)....................1, 47

## STATEMENT REGARDING ADOPTION OF BRIEFS

Regions adopts the statement of jurisdiction by Appellants, but not any other portions of Appellants' Initial Brief.

## STATEMENT OF THE ISSUES

Appellants have raised five issues on appeal:

(1)    Did the court err in concluding there was no genuine issue of material fact on Regions' insecurity in the face of a voluminous trail of contemporary correspondence and later testimony about Regions' concerns about the Appellants' doubtful ability to repay their loans;

(2)    Did the court err in construing Regions' rights, and the exercise of those rights, under the Promissory Note and Escrow Agreement;

(3)    Did the court err in concluding there was no genuine issue of material fact regarding whether Regions owed a fiduciary duty to the Appellants, where Appellants were sophisticated, well-educated professionals from the real estate mortgage industry who even owned a mortgage brokerage business that was licensed in Florida;

(4)    Did the court err in concluding there was no genuine issue of material fact regarding whether the subject refinancing debt was for consumer or business purposes pursuant to the Florida Consumer Collections Practices Act ("FCCPA"), § 559.72(9), Fla. Stat., in light of the fact that the lot in question was only one of six properties and three vacant lots owned by the Appellants, which had been vacant for four years and which was listed for sale at the time of the subject refinancing;

1

(5)    Did the trial court abuse its discretion in awarding Regions its reasonable attorneys' fees incurred in defending against Appellants' affirmative claims and in prosecuting its counterclaim, where Appellants expressly used their affirmative claims as identical defenses to Regions' counterclaim.

## **STATEMENT OF THE CASE**

### *Nature of the Case*

This lawsuit is simply Appellants' attempt to avoid responsibility for one of many speculative real estate investments made between 2004 and 2008. The evidence, described in further detail below, demonstrated that Appellants were sophisticated real estate professionals who owned multiple properties financed by multiple lenders, and that Regions owed no special duty to them. Among other things, Appellant Myers had begun his career in commercial real estate in 1983, and Appellant Kelly had begun working in real estate marketing in 1990. (R. 121, at ¶¶4, 6.) In 1995, Kelly opened a mortgage brokerage business in Maryland; Kelly was the president, and Myers was an executive vice president who was reportedly paid as much as $450,000 in 2006 originating mortgage loans. (*Id.*, at ¶7.) Myers even obtained his mortgage brokerage license in Florida in 2007. (*Id.*, at ¶8.) At the same time, Myers traded securities through Charles Schwab accounts at annual volumes well in excess of $10,000,000. (*Id.*, at ¶13.) Between 2002 and 2005, Appellants purchased multiple properties in Florida, and by 2006 owned two houses and three additional vacant lots in the state. (*Id.*, at ¶¶14-18.)

When the Appellants began to struggle financially, Regions accommodated them by extending additional capital in a cash-out refinancing requested by Appellants so that they could continue to make their payments while trying to

liquidate one of their properties.   (*Id.*, at ¶¶37, 42.)   The funds from that refinancing were placed in an escrow managed by Regions as Escrow Agent, with the express agreement of the Appellants. (*Id.*, at ¶43; R. 107-13.)  When it became clear to Regions, however, that Appellants' short-term liquidity crisis had not been cured and that there was no prospect for it to be cured since, among other things, the Appellants had not continued to list their properties in order to obtain liquidity, they asked for further unrealistic financing, and they refused to provide updated financial information to Regions' loss mitigation department for a long-term solution, Regions as the Secured Party to the Escrow Agreement directed the temporary suspension of  payments from the Escrow Account.  (R. 107-12, at 131:19-132:8, 142:1-23, 148:11-149:3, 200:12-21; R. 107-19; R. 107-20; R. 107-4, at 169:21-25.)  Escrow payments were reinstated after the Appellants began to communicate again with Regions to attempt to develop a long-term solution.  (R. 107-16, at 104:1-22; R. 107-12, at 167:1-170:12; R. 107-23.)

Appellants, however, having suffered no actual damages, nevertheless filed this lawsuit against Regions based upon legal theories that simply do not pass muster -- considering the undisputed facts.  The issues that they raise now on appeal involve no error by the trial court in her well-reasoned opinion.  In many instances, these issues were also not raised for the first time until months after the court's ruling (or are even being raised for the first time now).  After inflicting

4

enormous unnecessary legal costs on Regions in the trial court proceeding, Appellants now also challenge the well-reasoned order of the lower court regarding the reasonableness of Regions' fees -- even though Appellants failed to provide a reasonableness affidavit in accordance with the lower court's rules.

The lower court's well-reasoned orders on appeal should be affirmed.

### *Course of Proceedings and Dispositions in the Court Below*

Appellants filed this lawsuit on May 24, 2011 (R. 1), and amended their complaint twice (R. 16, 88). Regions asserted a counterclaim on September 5, 2012. (R. 93.) After extensive discovery, the parties filed cross-motions for summary judgment on October 18, 2012. (R. 106, R. 111.) The lower court entered summary judgment in Regions' favor on September 30, 2013. (R. 173.) The lower court's order on summary judgment determined that Regions was entitled to the attorneys' fees and costs incurred in pursuing its collection on the debt at issue in the counterclaim (R. 173, at 14), and provided Regions 14 days to provide proof of the total debt amount and proof of its reasonable attorneys' fees related to Count Two of its counterclaim. (R. 173, at 14-15.) Regions submitted its proof (S.R. 176, S.R. 177, R. 178),[1] and the lower court entered judgment for the amount of the debt plus the amount of fees and costs incurred in its collection

---

[1] Regions' motion for fees (R. 176) and reasonableness declaration by an outside attorney (R. 177) were not included by Appellants in their appendix, but will be provided in a supplemental appendix by Regions.

(R. 187, 188). Seventeen months after the briefing on summary judgment had been closed, and six months after the court's order on summary judgment was entered, Appellants filed a Motion to Alter or Amend Judgment under Federal Rule of Civil Procedure 59(e) on March 27, 2014. (R. 195.) The court denied this motion on May 29, 2014. (R. 206.) Appellants now appeal (1) the lower court's order entering summary judgment in Regions' favor (R. 173); (2) the lower court's order awarding Regions its damages on the counterclaim (R. 187); and (3) the lower court's order denying Appellant's Motion to Alter or Amend Judgment (R. 206).

### *Statement of the Facts*

**1.     <u>Introduction to Facts</u>**

Despite the mandates of F.R.A.P. 28 and 11th Circuit Rule 28-1(i)(2), Appellants' Initial Brief contains <u>no</u> statement of the facts contained in the record, including only a statement regarding certain allegations from the pleadings. As such, Regions submits the following Statement of the Facts.

**2.     <u>The Appellants Were Sophisticated Real Estate and Finance Professionals Who Invested in Numerous Florida Properties Using Multiple Lenders</u>**

This action concerns Appellants' claims that Regions acted wrongfully with respect to a May 2008 "cash out refinance" of a single unimproved coastal lot Appellants purchased on speculation in the Florida panhandle in March 2004 ("Seaside Lot 6"). Appellants' arguments below suggested that they were an

unsophisticated couple from Maryland who were manipulated by Regions between 2004 and 2009 in connection with Appellants' financing and subsequent refinancing of Seaside Lot 6.  As the record below demonstrated, however, this tale was without factual support.

Appellants were Maryland residents, but they were not strangers to the Florida panhandle, nor were they unsophisticated.  Appellant Kelly vacationed there during her college days in Mobile, Alabama in the 1980s, and Appellants' family has vacationed in the panhandle since 2000.  (R. 121, at ¶2.)  They purchased a second home on the Florida panhandle in Watercolor in 2002.  (R. 107-2, at 92:21-93:25.)  That vacation home, like Appellants' primary home – a 4,000 square-foot residence in Bethesda, Maryland – was not financed by Regions, nor was Regions otherwise involved.  (*Id.*; R. 107-2, at 8:20-10:7, 91:12-19.)

Between March and October 2004, Appellants bought three expensive undeveloped coastal lots in the Florida panhandle (Seaside Lot 6; Seaside Lot 13; and Watercolor Lot 3).  (R. 107-2, at 97:8-24, 108:24-109:2; R. 121, at ¶15.)  Regions' predecessor AmSouth Bank financed two of those lots, but had no role in bringing any property to Appellants' attention.  (R. 107-2, at 108:20-109:22, 115:2-13, 140:9-141:3.)  The loans were structured to require interest-only payments with a balloon payment due after 36 months.  (R. 107-2, at 143:20-146:5.)  Then in June 2005, Appellants purchased yet another 4,000 square-foot

house, in Naples, Florida. (R. 121, at ¶16.) Regions' predecessor AmSouth Bank provided the initial financing on the Naples property, though it did not find the property or recommend it to Appellants. (*Id.*) Appellants thereafter obtained a second mortgage and a line of credit on the Naples house through financial institutions other than Regions and without Regions' help or advice. (R. 121, at ¶17.)

Thus, by 2006, Appellants owned, in addition to their Maryland residence, two "second homes" in Florida (one in Watercolor and another in Naples), and three undeveloped coastal lots in the panhandle (including Seaside Lot 6, the only property at the core of this dispute). (R. 107-2, at 100:1-6.) Appellants also established a Home Equity Line of Credit ("HELOC") with Regions, secured by their original "second home" in Watercolor. (R. 107-2, at 9:14-16, 300:13-301:1; R. 107-8.) Appellants used the HELOC to its full balance and never repaid Regions the amount owed. (R. 107-2, at 301:16-20.)[2]

During this time, Appellants also owned a mortgage brokerage business, MetFund Mortgage Services, that paid Myers $450,000 in 2006. (R. 121, at ¶7.) Kelly was the president and sole owner of the business. (*Id.*) To supplement Appellants' income, Myers also was trading in excess of $10 million in stock

---

[2] This HELOC account was the subject of Regions' counterclaim.

annually through a Charles Schwab account.  (R. 121, at ¶13.)[3]  Regions did not have any role regarding advising Myers about entering and conducting such an undertaking, nor did the bank have any role whatsoever in Appellants' mortgage brokerage business.

The relationship between Regions and Appellants was one of lender and borrower.  Outside of financing some of Appellants' substantial Florida real estate portfolio, Regions had no role in managing Appellants' finances or providing investment advice.  Kelly has conceded that no one at Regions was her financial advisor.  (R. 107-1, at 52:21-53:13, 31:6-12, 37:5-9.)  Myers, too, conceded that Regions was not managing Appellants' money, as he kept the majority of Appellants' money in their SunTrust Bank account or in his Charles Schwab trading account.  (R. 121, at ¶13.)  Appellants received financing from at least six other lenders for their various property holdings.  (R. 107-22, at REGIONS 000208.)

---

[3] The underlying testimony and documents supporting these facts were filed under seal with the lower court at R. 116, Exhibits 1, 2, 3 and 4.  To the extent the sealing of these exhibits impedes their review, Regions notes that these facts were included in the statement of facts in support of Regions' Motion for Summary Judgment, and the Appellants opposed only Regions' characterization of the trading as "day trading."  (R. 121, at ¶13.)  *See* N.D. Fla. Loc. R. 56.1(A) ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be filed and served by the opposing party.").

**3.  Regions Accommodated Appellants in 2007 When the Real Estate Bubble Burst**

When the real estate bubble burst in 2007, Appellants' opportunity to sell the three coastal lots for large profits disappeared.  And, by the end of 2007, the collapse of the nationwide housing market also effectively closed MetFund Mortgage Services; Appellants' primary source of income necessary to support monthly payments for six mortgages was gone.  (R. 107-2, at 58:1-13; R. 107-1, 58:19-59:4.)  In addition, Myers' trading activities resulted in massive losses on high trading volume.  (R. 116-4, at 266:5-24, 270:21-271:10; R. 107-28 (located at R. 116-2) at 6; R. 107-29 (located at R. 116-3) at 6.)[4]  Regions obviously had nothing to do with these problems.

Unaware of the imminent failure of Appellants' business, Regions accommodated Appellants by agreeing to do what it was doing for many of its customers in 2007: Regions renewed Appellants' loans to postpone the balloon payments from March 2007 to March 2010.  (R. 107-2, at 156:16-157:2; R. 107-11.)

**4.  Regions Accommodated Appellants in 2008 When Appellants' Faced What Regions Was Told Was a Short-Term Liquidity Problem**

Approximately one year later, in April 2008, Myers represented that Appellants would soon be unable to continue making their monthly payments to

---

[4] See note 3, *supra*.  The supporting documents reflecting the specific amounts were filed with the lower court under seal as exhibits to R. 116.

10

Regions.  (R. 118-2, at 132:10-133:17.)  Myers requested a "cash-out" refinance agreement to allow Appellants more time to sell one or more of their Florida properties, which Myers had already listed for sale in 2007.  (R. 121, at ¶37; R. 107-2 at 165:2-168:6; R. 107-4 at 137:20-25, 139:3-18.)  That is, Appellants sought to increase their loan obligation to Regions by proposing to take a "minimum" of $315,000 of equity out of Seaside Lot 6, with the "cash out" being used to meet monthly mortgage and related payments (*i.e.,* taxes, homeowners' association dues, and insurance), while Myers attempted to sell Seaside Lot 6 and other Florida real estate.  (*Id.*; R. 121, at ¶¶37, 42-43.)

Regions obtained an independent appraisal that valued Seaside Lot 6 at $1,425,000, which was well in excess of the principal amount due (less than $900,000), but slightly less than the $1.5 million at which Myers had listed Seaside Lot 6 for sale.  (R. 107-12, at 65:9-67:9; R. 107-3, at 4.)  Regions agreed to accommodate Appellants yet again; however, this time it was specifically based upon Appellants' agreement that the "cash out" funds were to be held in an escrow account to make the agreed payments while Appellants sought to sell at least one of their Florida investment properties.  (R. 121, at ¶¶42-43.)  Appellants executed a new promissory note in the principal amount of $1,068,000 secured by a mortgage, and signed a Collateral Deposit Escrow Agreement (the "Escrow Agreement") in

May 2008.  (R. 121, at ¶44; R. 107-14.)  The escrow account was funded with $241,838.90.  (R. 107-13; R. 121, at ¶43.)

**5.**    **Regions Became Insecure in 2009 Based on Information That Appellants' Ability to Repay Their Loans Was Impaired Long-Term**

In March 2009, Cynthia Villanova of Regions advised a colleague in the loss mitigation group that "I have a client, Greg Myers, who is recognizing that he is going to have a hard time in several months."  (R. 107-16, at 30:19-32:10; R. 107-17, at REGIONS2348.)  Then, in June 2009, when only approximately $45,000 remained in the escrow account, Villanova sent an email stating that Myers informed her that Appellants would be unable to make payments when the escrow was deleted over the next few months, Appellants might file for Chapter 11 bankruptcy, and that Regions' only alternative was to "take the lots back and lose money."  (R. 107-4, 173:18-174:22; R. 107-18 at REGIONS2355-56).  According to Villanova, Myers further disclosed that he had failed to attempt to sell any of his properties (because he did not want to take a loss) and that no properties were currently listed for sale.  (*Id.*)  Villanova advised that Myers proposed that Regions loan Appellants yet another $1 million, which would be used for two purposes:  (1) to build a house on Seaside Lot 6 to make the property more marketable; and (2) to cover the existing mortgage, HELOC, tax, insurance and homeowners' association payments until Seaside Lot 6 could be sold.  (*Id.*)

Myers' demand in the face of financial disaster, coupled with his inability to repay loans and failure to take any steps to sell any properties, caused Regions' Senior Credit Officer to believe that Appellants' ability to pay their loan obligations was impaired.  (R. 107-12, at 111:7-114:19, 121:14-122:25, 168:13-170:12.)[5]  Weeks before the next mortgage payments were due, Regions, as the Secured Party under the Escrow Agreement, advised Myers that it would no longer accept distributions from the escrow account and that Myers had to cooperate with Regions' loss mitigation group by providing current financial information necessary to reach a long-term resolution.  (R. 107-12, at 131:19-132:8, 148:11-149:3, 200:12-21; R. 107-19; R. 107-20; R. 107-4, at 169:21-25; R. 107-2, at 229:19-231:3.)

## 6.    Regions Attempted to Reach a Long-Term Solution With Appellants

Regions offered the assistance of its Loss Mitigation Department, which specialized in finding solutions to situations where borrowers were involuntarily unable to meet their financial obligations, but Appellants failed and refused to provide the updated financial information requested from July 2009 until late October 2009.  (R. 107-16, at 43:16-49:10, 50:20-51:20, 62:13-63:16; R. 107-2, at

---

[5] Myers attempts to create a disputed fact by denying that he made these representations to Villanova.  This feigned dispute, however, is immaterial.  What is relevant and material – and undisputed – is that these issues were conveyed to the decision maker at Regions, Bloetscher, and he determined that the bank was insecure.

214:6-215:13, 215:25-216:11; R. 107:4, at 152:5-20, 159:10-160:15; R. 107-12, at 127:8-128-7; R. 107-21.)  When Appellants did provide the requested information, it showed that Appellants had amassed over $8.6 million in real estate-related debt, which required monthly payments of more than $50,000.  (R. 121, at ¶56.)  After receipt of Appellants' updated financial information, and as part of a plan to move forward with a loss mitigation solution, Regions requested the distribution of $41,790.83 of the remaining $45,765.72 in the escrow account to pay to itself amounts that had not been paid between July and October 2009.   (No tax, insurance, homeowners' fees, or obligations to any entity other than Regions were ever withheld.)  (R. 107-16, at 104:1-22; R. 107-12, at 167:1-170:12; R. 107-23.)  In addition, credit delinquencies reported by Regions were reversed.  (R. 107-16, at 113:9-22, 114:13-116:18.)

**7.**     **Appellants Filed This Lawsuit Alleging That Regions' Suspension of Payments to Itself for Three Months Caused Them Extraordinary Damages**

In their complaint, Appellants claimed that Regions' temporary suspension of payments under the escrow agreement between July and November 2009 caused them emotional distress, credit injury and employment-related damages.  By way of example, Appellants blamed Regions in their complaint because American Express cancelled Appellants' American Express card in late 2009, even though American Express' documents confirm that the business card was cancelled

14

because Kelly refused to respond to American Express' requests for financial information.  (R. 107-1, at 106:3-107:16, 109:22-110:5; R. 107-2, at 232:6-234:9; R. 107-27.)  Similarly, Appellants tried to blame Regions in their complaint for the loss of Myers' job and future earnings as a wealth manager, even though Myers voluntarily resigned from his position shortly after being informed by his employer that he was going to be terminated within weeks due to significant performance shortcomings.  (R. 107-25, at ¶¶3-4; R. 107-2, at 290:4-291:19.)  There was no evidence that Appellants were denied a single loan or job because of Regions' decision to temporarily suspend payments from the escrow account in July 2009.  (R. 107-2, at 238:2-4.)  Finally, Appellants claimed damages for emotional distress, even though Myers admitted that his stress resulted from the collapse of Appellants' mortgage business in 2007 (at least 18 months before Regions' decision to suspend payments under the Escrow Agreement).  (R. 107-2, at 58:1-59:7, 280:21-281:25.)

### *Standards of Review*

The standard of review of the district court's grant of summary judgment is *de novo*, applying the same legal standards used by the District Court Judge, M. Casey Rodgers, Chief Judge of the Northern District of Florida.

However, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).  An issue of fact is "material" if it might affect the outcome of the case under the governing law, and it is "genuine" if the record taken as a whole could lead a rational fact finder to find for the non-moving party.  *Id.*

A mere scintilla of evidence in support of the nonmoving party's position will not suffice to demonstrate a genuine issue of material fact and thereby preclude summary judgment. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).  Moreover, "the nonmoving party cannot create a genuine issue of material fact through speculation, conjecture, or evidence that is 'merely colorable' or 'not significantly probative.'" *Vega v. Invsco Group, Ltd.*, 432 Fed. App'x. 867, 869-70 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 249-50).

This Court must "review the denial of a motion to alter or amend a judgment under Rule 59(e) for abuse of discretion."  *Shuford v. Fidelity Nat. Property & Cas. Ins. Co.*, 508 F.3d 1337, 1341 (11th Cir. 2007).  Moreover, a party "cannot use a Rule 59(e) motion to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." *Michael Linet, Inc. v. Village of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005).

Finally, the standard of review for a court's order granting a motion for attorney's fees is "abuse of discretion; nevertheless, that standard of review still

allows [the Court] to closely scrutinize questions of law decided by the district court in reaching a fee award." *Clark v. Hous. Auth. of Alma*, 971 F.2d 723, 728 (11th Cir. 1992).    In determining fee awards, "[b]ecause a district court's interpretation of its own rules should be granted deference, [this Court should] decline, in the present case, to second-guess the district court's interpretation of its own Rule."    *Id.*

## SUMMARY OF THE ARGUMENT

The Appellants are, and have been since long before their first contact with Regions, sophisticated real estate marketing, development and mortgage brokerage professionals.  (R. 121, at ¶¶4-8.)  They were the quintessential land speculators in Florida real estate before the crash.   They owned and operated a substantial mortgage investment business in Maryland (their home state), which business yielded mid-six-figure income for them before it collapsed in the  housing bubble disaster.  (R. 121, at ¶¶7, 9.)  Appellant Myers even obtained a mortgage brokerage license in Florida and, beginning in 2008, worked as an investment advisor representative for an investment advisory firm whose clients were ultra-affluent individuals and families.   (R. 121, at ¶¶8, 10.)   Appellants also invested the substantial assets in a self-traded equity account at annual volumes in excess of $10 million, and generated substantial losses in 2007, without any involvement by or advice from Regions.  (R. 121 at ¶13.)

17

In addition to these assets, the Appellants acquired multiple houses (besides their large "first" Maryland home) in Florida, as well as several unimproved investment lots. (R. 121, at ¶¶14-18.) Although Appellants received some financing from Regions, their own records show that they used at least six other lenders for financing these various property holdings. (R. 107-22, at REGIONS 000208.) There was no genuine issue of material fact that Regions did no more than loan money for real estate mortgages along with these other institutions who did the same for Appellants.

Appellants' arguments on the four issues affecting the ruling on summary judgment completely skew the record on appeal. The lower court correctly concluded that there was no genuine issue of material fact precluding summary judgment in favor of Regions:

(1) Regions fully established that the Appellants' financial situation after the crash allowed it to be uncertain as to whether the ability to repay had been impaired, leading to Regions' insecurity, and the Appellants wholly failed to satisfy their burden to show lack of good faith by the lender.

(2) Regions, as the secured creditor under the Escrow Agreement, acted fully within its rights to protect its interests, and no issue of law or fact has been properly raised to the contrary.

18

(3)  Regions, and its employees, acted at all times as the lender on certain discrete loans, and neither had nor exercised any fiduciary relationship with the Appellants, sophisticated mortgage investors who self-managed their extensive real estate and financial assets.

(4)  The loan on the single unimproved investment lot was neither factually nor legally ever a loan for primarily personal, family or household purposes under the Florida Consumer Collections Practices Act, particularly where the purpose of refinanced debt was to provide time to sell the lot that was already listed for sale.

In addition to the absence of any genuine issue of material fact, or a legal issue, supporting the above arguments, Appellants have argued here issues which were never properly raised below, and which were either belatedly raised first in the Rule 59(e) motion or, even later, here on appeal, including: the claimed integration argument of the note and escrow agreement; the claim concerning Villanova's securities licenses; the claim that Villanova first raised the "cash-out" aspect of the refinancing; the suggestion that Bloetscher said the Appellants had funds available to pay; and the claimed materiality of a Regions first mortgage on an unrelated "second" (or third) home.

Finally, the trial court did not abuse its discretion by concluding, after review of the records, that the bank's attorneys' fees for collecting the note and

defending identical claims/defenses by the Appellants were reasonable and had not been properly challenged.

The lower court's orders were in every respect proper and should be affirmed.

## ARGUMENT AND CITATIONS OF AUTHORITIES

### A.    Regions was indisputably insecure

#### 1.    There was substantial undisputed evidence in the record for the court to find no genuine issue of material fact regarding Regions' ability to act based on "insecurity"

Appellants argue that there is "absolutely no evidence" in the record of Regions' claim of "insecurity."  That is demonstrably false, and Appellants' suggestion that Regions' "insecurity" is unsupported or materially disputed in the record is extraordinary.  The record is full of factual support for the reasons why Regions became insecure, which were summarized for the lower court in Regions' Motion for Summary Judgment and supporting papers, and the record contains nothing to validly dispute that evidence.

#### (a)    The operation of the insecurity provision

"Insecurity" is an event of default under the promissory note signed by the Appellants on the same day as the Escrow Agreement.  It states,

> **DEFAULT.**   I will be in default under this Note if any of the following happen: …  **Insecurity**.  Lender in good faith believes itself insecure.

(R. 107-14, at 1.)   This insecurity provision is valid and enforceable, and the

burden of proving that Regions was <u>not</u> acting in good faith shifted to Appellants.

Florida law is crystal clear:

> A term providing that one party …   may accelerate payment or
> performance … 'when she or he deems herself or himself insecure' or
> in words of similar import must be construed to mean that she or he
> has power to do so only if she or he in good faith believes that the
> prospect of payment or performance is impaired.   <u>The burden of
> establishing lack of good faith is on the party against whom the power
> has been exercised</u>.

*See* § 671.208, Fla. Stat. (emphasis added);  *Quest v. Barnett Bank*, 397 So. 2d

1020, 1021-22 (Fla. 1st DCA 1981) (upholding insecurity clause because "the

debtor here has not presented substantial proof that the bank's concern about the

security of its notes, whether or not reasonable, was not genuine, or that the bank

had an ulterior motive. There was consequently no fact issue to be determined by a

jury that the bank accelerated without good faith.").

### (b)   The law does not require that a lender use the talismanic term "insecure" when it determines a borrower's payment likelihood is impaired

One fundamental problem with Appellants' argument is that it presumes that

to qualify as "insecure," a party must explicitly use the talismanic or magic word

"insecure" in describing its own concerns about the impairment of a borrower's

repayment ability.  Appellants argue that all of the evidence of Regions' reaction to

Appellants' financial troubles can be ignored because the precise term "insecurity"

21

was not used verbatim by Regions' employees, who instead used a variety of other phrases to articulate their concerns regarding Appellants' impaired ability to meet their loan obligations.  This effort to elevate form over substance ignores the fundamental factual realities closely examined by the lower court.

Florida law makes clear that, regardless of whether the term "insecure" or some other comparable term appears in the agreement itself, "insecurity" means that the lender "believes that the prospect of payment or performance is impaired." § 671.208, Fla. Stat.  The law is clear that a legal right is triggered based on the substance of conduct and expression, rather than requiring the talismanic use of the particular legal term which describes the right.[6]

---

[6] *See, e.g., Arris Group, Inc. v. British Telecommc'ns PLC*, 639 F.3d 1368, 1379 (11th Cir. 2011) (holding that where a declaratory judgment action is available in the event of a threat of "litigation" or "infringement," that such right "cannot be defeated simply by the stratagem of a correspondence that avoids magic words such as 'litigation' or 'infringement.' …," and furthermore stating that "even in the absence of an express accusation…, we think the circumstances indicate there is a dispute … concerning … liability for contributory infringement that is sufficient to constitute an Article III case or controversy."); *Giddens v. Equitable Life Assur. Soc. of U.S.*, 445 F.3d 1286, 1293 (11th Cir. 2006) (where a disability insurance policy covered the inability to perform the "substantial and material" duties of the insured's occupation, the court must reject the "argument that there is a factual issue simply because [Plaintiff] failed to use the magic words 'substantial and material' in his affidavit…," and stating that "it is clear that the point of [Plaintiff's] testimony was that the elements listed as 'functional requirements and tasks' were in fact the substantial and material duties of his occupation."); *U.S. ex rel. Ragghianti Founds. III, LLC v. Peter R. Brown Const., Inc.*, No. 8:12–cv–942–T–33MAP, 2014 WL 4791999, at *29 (M.D. Fla. Sept. 19, 2014) ("In order to establish that repairs are necessary and reasonable, the magic words 'reasonable' and 'necessary' need not be used; the injured party need only present sufficient

**(c)    There is voluminous evidence in the record that Regions was "insecure" because it believed in good faith that the prospect of payment or performance was impaired**

The record of Regions' undisputed good faith belief that it was insecure in July 2009 runs throughout the evidentiary record.  By way of background, Regions' developing awareness of the Appellants' potential inability to repay their loans began in 2008.  As described above, the Appellants' liquidity problems were first addressed in 2008 by the "cash-out" refinancing.  (R. 121, at ¶42.)  The purpose of that cash-out refinancing in 2008 was to provide Appellants additional time to solve a short-term liquidity problem so that their loans would not go into default.  (*Id.*)  As Regions understood in 2008, the Appellants already had a liquidity problem and an impairment in the ability to pay, but also had equity in property that they could try to sell in order to cure that problem.  (R. 107-4, at 139:3-23.)  The record is full of evidence regarding this issue.

For instance, in April 2008, Myers represented to Villanova that Appellants would soon be unable to continue making their monthly payments to Regions:

---

competent testimony so that the trier of fact is justified in concluding that the repairs are necessary and that the cost of repair is reasonable.") (citation omitted); *Mastro v. Seminole Tribe of Florida*, No. 2:12–cv–411–FtM–38UAM, 2013 WL 3350567, at *6 (M.D. Fla. July 2, 2013) ("While a contractual waiver of sovereign immunity must be unequivocal, it need not contain " 'magic words' stating that the tribe hereby waives its sovereign immunity.") (quoting *Rosebud Sioux Tribe v. Val–U Const. Co. of S.D., Inc*., 50 F.3d 560, 563 (8th Cir. 1995)).

Q    What was the reason why, other than that Mr. Myers asked for some sort of arrangement, what was the reason why this agreement was created?

               *              *             *

A    It was created because Mr. Myers had approached me about his cash flow challenges. He indicated that he needed some time to get through this market and suggested that we pull some of the equity out of Lot 6, Seaside, and deposit it into his account. …. The intent of the funds was to carry the Regions obligations associated with the loans and the taxes, insurance and homeowners' dues for those properties. We couldn't put the funds in his checking account as suggested [by Myers] and feel confident that those payments would be -- that those dollars would be used to make these payments. So the escrow agreement was established so that the payment could be made only to the parties listed in the exhibit.

(R. 118-2, at 132:10-133:2.)   As Villanova further testified, "Mr. Myers had indicated that he was anticipating challenges with cash flow and had asked that we consider … pulling out some cash ….". (*Id.*, at 124:3-12.)  She also testified that "[h]e indicated that it was his desire to sell these properties, or get out from at least one of them, to either make some money or alleviate the cash flow, the additional monthly debt. Again, the whole purpose around this cash-out and putting it in this account was to give [Appellants] the time so that they could sell something ….". (*Id.*, at 139:3-23.)[7]

---

[7]   Less than two months later, Myers sought an unsecured loan for an additional $200,000 from Regions, further illustrating that Appellants liquidity problems were not resolving themselves. (R. 107-2, at 203:5-204,9; 206:13-207:1, 207:17-22.) Likewise, in February 2009, Regions reduced the interest rate on the May 2008 promissory note to 5%. (R. 107-2, at 212:2-21; R. 107-15.)

Whether Appellants formally "agreed" to list the property for sale or not, the refinancing was premised on the idea that without selling one of those properties, the liquidity problem would not be cured. As it turned out, Appellants did not sell, or even continue to list the properties, and the liquidity problem was therefore not solved. The Appellants' struggles and failure to solve or even address their ongoing liquidity problem was further raised to the bank by the Appellants in March 2009, when Myers contacted Villanova. Villanova subsequently contacted Mosley in Regions' Loss Mitigation Department to advise of Appellants' financial difficulties. (R. 107-16, at 30:19-32:10; R. 107-17.) She stated to Mosley in the email, "I have a client, Greg Myers, who is recognizing that he is going to have a hard time in several months." (R. 107-17, at REGIONS2348.)

Mosley directed her loss mitigation team to contact Myers to collect information from Appellants, but Appellants did not provide the requested information. (R. 107-16, at 32:25-33:25, 45:11-18, 46:18-47:8.) On June 12, 2009, Villanova reported in an internal email stating directly that, based on her communications with Myers, Appellants were not going to be able to make their payments:

> [Myers] cannot afford to pay these payments going forward. ….
> [Myers] wants to build on the lot …. He wants to borrow
> approximately $1 MM. He believes that the property is much more
> marketable with a home on it. He says that the alternative is that we
> take the lots back and lose money. He also said that one of his
> alternatives is to file Chapter 11. … I like [Myers]. I don't feel that

25

I can present this loan request … He told me that he doesn't want to speak with someone who will just lower his rate. I'm out of ideas here.

(R. 107-18, at REGIONS2356.)[8]

On July 3, 2009, Bloetscher stated his concerns about repayment impairment and the need for current financial information in an email:

> We are not going to advance any additional funds to Mr. Myers for him to build a home. I think we've already been very flexible and creative on this one. **I'm worried that he may not have listed the two properties below for sale**, as agreed. If he has not followed through with his agreement with us then I don't want to advance any more funds from the trust account to make payments for him. …. If he is experiencing financial hardship then he needs to get in touch with Tobi Mosley in our Customer Assistance department to figure out a workout plan on these three loans.

(R. 107-19, at REGIONS1987) (emphasis added.)  This specifically references Bloetscher's concerns that the Appellants had not attempted to sell the properties, which, to Regions' knowledge, was the only path to curing their pre-existing liquidity problem.

Appellants have suggested that Regions should not have factored Appellants' reported failure to list their properties in its determination to instruct

---

[8]   Notwithstanding Appellants' efforts to create immaterial "he said/she said" disputes, Regions had sufficiently valid concerns to qualify as "insecure," including, among other things, Myers' communications to Villanova about his financial challenges, Appellants' failure to sell or list their properties, a request for further unrealistic financing, and the failure to provide current financial information to the loss mitigation department.  (R. 107-12, at 111:7-114:19, 121:14-122:25, 168:13-170:12.)

the suspension of escrow payments. But the undisputed record shows that Regions considered the value of those properties and the accompanying liquidity in their potential sale to be a critical element of the Appellants' long-term ability to overcome their liquidity crisis and meet their loan obligations. (R. 121, at ¶42.) As such, the status of whether those properties were listed and could be used to resolve Appellants' liquidity problems was certainly a factor that validly contributed to Regions' insecurity. No material fact(s) compels any conclusion that this consideration was unreasonable.

Moreover, Bloetscher testified that the information received from his colleagues about Myers in June and July 2009 made Regions insecure about whether Appellants were able and willing to meet their repayment obligations, even if he did not use the term "insecure":

> Q: Well, you knew he [Myers] wanted you to make the payments that were due on the loans. He called and told Ms. Villanova twice that she had no right to stop making the payments, didn't he?

> A: He originally told us, when we gave him cash out on the refinance, that he had a temporary liquidity situation and needed the cash out to give him time to sell one of the properties. Therefore, since that didn't happen, we were uncertain as to what his circumstances were at the present.

> Q: So the problem was you wanted to get information from him to try and find a permanent solution?

> A: We wanted to get a permanent solution.

Q:    And so in order to make sure that you could come to a permanent solution with him, you stopped making the payments from the escrow account?

*                          *                          *

A:    In order to determine what the appropriate long-term solution was for him, we needed to get that financial information and we needed his cooperation.

*                          *                          *

Q:    Isn't it true that you stopped making the payments so that you could get some leverage over Mr. Myers and force him to deal with the situation?

A:    We stopped making the payments because we found out the properties weren't listed for sale, he was not providing the necessary information that we needed, and also because he requested another million dollars cash out to build a house on the property.

(R. 107-12, at 168:17-170:12.)   It is clear that Bloetscher was relying on the information he received from Villanova and other colleagues, and that he alone made the decision.

Q    Was there anyone else at Regions who was involved in the decision-making process with respect to discontinuing payments from the escrow account?

A    The decision to discontinue payments from the escrow account?

Q    In July 2009.

A    It was me by myself after the conversation between [Ms. Villanova] and Mr. Myers and Wanda Casey and Mr. Myers.

Q    Did anyone else have input into the decision that you ultimately made?

A    [Ms. Villanova] and I discussed the decision, and she was in agreement.  But it was my decision at the end of the day.

28

(R. 118-3, at 200:12-201:1.)

The record further demonstrates that based on information subsequently provided to Regions, its insecurity was well founded.   For instance, in July 2009, Regions again offered Myers the assistance of its Loss Mitigation Department without success.    (R. 107-16, at 43:16-49:10, 50:20-51:20, 62:13-63:16.) Appellants failed to provide Regions with the requested financial information until late October 2009.  (R. 107-2, at 214:6-215:13, 215:25-216:11; R. 107-4, at 152:5-20, 159:10-160:15; R. 107-12, at 127:8-128:7; R. 107-21.)[9]   When Regions finally received the financial information, it indicated that Appellants had amassed over $8.6 million in real estate-related debt, which required monthly payments of more than $50,000.   (R. 107-1, at 72:8-73:2; R. 107-22 at REGIONS208; R. 121, at ¶56.)

Thus, it cannot be disputed that Regions, acting through Bloetscher, was made insecure by Appellants' apparent inability and unwillingness to pay and by Appellants' failure to cooperate.  Appellants failed to meet their burden: there was

---

[9] Appellants assert that Bloetscher agreed that Villanova already had the information needed from Myers. (Initial Brief at 15 n.4.)  Bloetscher's testimony, when asked whether Appellants were responding, was "Cynthia [Villanova] had that information.  She would have provided it to the loss mit team."  (R. 195-2, 149:16-17.)  This follows substantial testimony reflecting Bloetscher's belief that Regions did not have the information requested.  (R. 195-2, at 142:12-23, 148:24-149:3.)  The clear implication is that Villanova would have known whether she had it or not, and that she "would have sent" it to the loss mitigation group if she did. Moreover, this is an immaterial factual argument that Appellants never raised in the case below.

absolutely no evidence that Bloetscher had an ulterior motive or that Regions acted in bad faith.  *See Quest*, 397 So. 2d at 1021-22.

> **2.    Appellants' assertion that "Bloetscher actually testified that Regions, in fact, was not insecure," completely distorts the record**

In Appellants' ill-founded attempt to argue that there is some real dispute about whether Regions was "insecure," Appellants selectively distort a single comment from the testimony of Bloetscher.  (Initial Brief at 17.)  Notably, Appellants did not raise this factual argument below until their Motion to Alter Judgment almost a year and a half after the briefing on summary judgment.  In any event, Appellants assert Bloetscher "testified that Regions, in fact, was not insecure during the relevant time periods because he assumed that the Appellants had resources (other than the money in the Escrow Agreement) to make the mortgage payments in other bank accounts."  (*Id.*)  That is false.

To the contrary, Bloetscher testified that the Appellants should be advised to contact the loss mitigation group at Regions to address their liquidity problems.  (R. 195-2, at 132:3-8.)  He further stated that *if* they were not willing to do so, then the only option was for Appellants to make their payments through other funds they may have available.  (R. 107-12, at 132:3-8, 18-23.)  When Bloetscher was asked the hypothetical question of where the Appellants would find other funds to pay those debts (*Id.*, at 132:9-13), he had already made clear that *if* Appellants did

not have the funds, they should contact the loss mitigation group (*Id.*, at 132:3-8).

Bloetscher never suggested that he knew whether or not Appellants actually had funds in other accounts. Indeed, he testified he could not know with certainty because the Appellants would not respond to the loss mitigation group. (*Id.*, at 142:12-23.) What he did know was that the Appellants had a longstanding liquidity problem, which they had not taken the opportunity to try to solve through listing properties for sale. (R. 107-12, at 130:11-17.) In no way did Bloetscher suggest he knew definitively that Appellants had other resources which would negate Regions' reasonable fears concerning Appellants' impaired ability to repay their loans.

### 3.    Regions was within its rights under the Promissory Note

Appellants argue that Regions never declared the Appellants in Default at the time that the Escrow Payments were suspended. As the lower court correctly noted, "Regions Bank had the authority as the secured creditor to demand immediate payment in full based on the insecurity but chose instead to refrain from declaring default immediately, which was well within its rights." (R. 206, at 2.) The Promissory Note provides that "[u]pon default, Lender *may* declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then I will pay that amount." (R. 88-1, at 1, emphasis added.) This agreed provision did not, however, restrict Regions from first

31

pursuing a remedy short of full acceleration when it became insecure. *See, e.g.,* *Lasco Enters., Inc. v. Kohlbrand*, 819 So. 2d 821, 825 (Fla. 5th DCA 2002) (holding that contract which "provided that the [Defendants] 'may' proceed in equity to enforce its rights or 'may' elect to receive the return of earnest money deposit…. does not state that the [Defendants] 'shall' limit themselves to such remedies."); *Rug Mart, Inc. v. Pellicci*, 384 So. 2d 1325, 1326 (Fla. 2d DCA 1980) (analyzing contractual provision stating that "[a]ny violation of the above contract or failure to make payments as agreed shall entitle the seller to all remedies of a secured party under the Florida Uniform Commercial Code," and holding "[w]e do not think the contract provision established Rug Mart's sole remedy for breach…".).

### B.    The trial court did not err in its interpretation of the Promissory Note and the Escrow Agreement

Appellants argue that the lower court erred when it "effectively incorporated the terms of a promissory note into the Escrow Agreement."  (Initial Brief at 18.) They go on to argue that the suspension of payments was not permitted through the "allowances of 'prior extrinsic agreements, oral or written' (the promissory note) to 'vary, alter or modify the terms' of the Escrow Agreement."  (Initial Brief at 19).  Appellants have long waived this argument, but in any event the court interpreted and applied both agreements correctly.

32

### 1.    This "Integration" Argument Was Not Preserved

First, Appellants "did not make this argument against summary judgment below so it has not been preserved for appeal." *Shumate v. Selma City Bd. of Educ.*, No. 13-14948, 2014 WL 4233265, at*3 (11th Cir. 2014) (citing *United States v. Obasohan*, 73 F.3d 309, 310 (11th Cir. 1996)). Appellants did raise a different "integration" or "merger clause" argument on summary judgment below, but only with respect to whether any oral agreement by Appellants to list the their properties for sale could affect the terms of the Escrow Agreement. To be sure, Appellants obliquely mentioned this new and distinct argument, that rights and duties under the Promissory Note cannot be merged into the Escrow Agreement theory, in a one-sentence bullet point in their Motion to Amend or Alter Judgment six months after summary judgment was entered. (R. 194, at 7.) That reference was made long after the time it should have been raised. *Michael Linet, Inc.*, 408 F.3d at 763.

### 2.    The Lower Court Correctly Applied the Terms of the Escrow Agreement

Appellants argue that the suspension of payments was not permitted based on the "allowances of 'prior extrinsic agreements, oral or written' (the promissory note) to 'vary, alter or modify the terms' of the Escrow Agreement." (Initial Brief at 19.) But the terms of the Escrow Agreement were not "varied, altered or

modified" in any way, and the lower court's explanation of how the escrow agreement operated correctly stated why there was no breach.

As the lower court recognized, under Alabama law, which governs the escrow agreement (R. 88-2, at 8), an escrow agent is "akin to a special agent and is limited in its liability to the proper performance of those duties and obligations specifically delineated in the escrow agreement and the specific goal." *Gurley v. Bank of Huntsville*, 349 So. 2d 43, 45 (Ala. 1977).    Moreover, "[t]he escrow instructions constitute the full measure of the agent's obligations and any other matters which arise in the transaction are collateral to the specific objectives of the escrow agreement." *Id.*

The Escrow Agreement in this case provides:

> The Escrow Agent shall release the Escrow Funds as authorized by the Secured Party and only in accordance with the instructions as set forth in "Exhibit A," or as otherwise expressly set forth in this Agreement.

(R. 88-2, at 1, ¶3.)  The escrow agreement further provides that,

> [S]hould the Escrow Agent become uncertain as to its duties under this Agreement, it shall be permitted to (a) immediately suspend the performance of any obligations (including without limitation any disbursement obligations) under this Agreement until such uncertainty shall be resolved to the sole satisfaction of Escrow Agent . . . . Escrow Agent shall have no liability to Depositor, Secured Party, . . . or any other person with respect to any such suspension of performance . . . specifically including any liability or claimed liability that may arise, or be alleged to have arisen, out of or as a result of any delay in the disbursement of the Escrow Funds . . . .

34

(R. 88-2, at 3, ¶6.)

Appellants alleged in Count I that Regions violated the Escrow Agreement by suspending monthly payments from the escrow account between July and November 2009. (R. 88, at ¶39) ("Regions Bank breached the Escrow Agreement by failing to ensure that the payments on [Appellants'] loans were timely made."). While that vague allegation did not state whether Regions breached its duties as the "secured party" or as "escrow agent," Appellants' Motion for Partial Summary Judgment made it clear that Appellants were challenging Regions' performance of its duties *as the escrow agent*. (R. 111, at 12, §3.) Here, the evidence is one-sided that Regions, as escrow agent, met its contractual obligations and cannot be held liable for breach of the Escrow Agreement. Notably, the Escrow Agreement expressly protects the escrow agent in the absence of gross negligence or willful misconduct. (R. 88-2, at ¶5.) There were no allegations, much less facts, demonstrating gross negligence or willful misconduct.

The evidence was undisputed. Appellants signed a contract, the Escrow Agreement, that expressly allowed Regions to serve as secured party and escrow agent. (R. 88-2, at 9, at ¶25) ("The Escrow Agent … may … lend money to the Depositor or the Secured Party and otherwise act as fully and freely as though it were not Escrow Agent under this Agreement. Nothing herein shall preclude Escrow Agent from acting in any other capacity for the Depositor or Secured Party

35

or for any other entity.").  The Appellants' contention that the Escrow Agreement was somehow improper is inconsistent with the fact they agreed that Regions would serve as both escrow agent and secured party and could act "as fully and freely as though it were not Escrow Agent under this Agreement."  (*Id.*)

Instructions to cease payments were received from the "Secured Party," and Regions, as escrow agent, complied with them.  After Appellants provided updated financial information, the escrow agent released the funds, as instructed.  These facts cannot support a finding of gross negligence or willful misconduct. Moreover, as the lower court correctly observed, "to the extent Regions Bank as the secured creditor had any duties under the escrow agreement, Plaintiffs failed to show what those duties were, how they differed from the duties of the escrow agent, and how those duties were breached."  (R. 206, at 2.)

### C.    There was no genuine dispute of material fact that Regions owed no fiduciary duty to Appellants

Appellants argue that the lower court erred in determining (1) that Appellants were owed no fiduciary duty by Regions, based on their mistaken contentions that the Escrow Agreement triggered an automatic duty, (2) that the evidence illustrated a special fiduciary relationship, or (in another belated argument) (3) that Villanova was independently a fiduciary under inapplicable securities laws.

### 1. The circumstances needed to establish a fiduciary duty under Florida law were not satisfied

Appellants make various arguments that there is a dispute of material fact regarding whether a fiduciary relationship was established between Regions and the Appellants.  They attempt to raise discrete disputes of fact, but there can be no genuine dispute of material fact on the issue of fiduciary duty in light of the overall picture:  the Appellants were highly sophisticated with regards to both real estate and financial matters and were the drivers in these transactions with Regions.

First, Florida law does not generally recognize a fiduciary relationship between debtors and creditors.  *See Watkins v. NCNB Nat'l Bank of Fla., N.A.*, 622 So. 2d 1063, 1065 (Fla. 3d DCA 1993), *rev. denied*, 634 So. 2d 629 (1994); *Taylor Woodrow Homes Fla., Inc.*, *v. 4/46-A Corp.*, 850 So. 2d 536, 540 (Fla. 5th DCA 2003).  "In an arms-length transaction, . . . there is no duty imposed on either party to act for the benefit or protection of the other party …."  *Watkins*, 622 So. 2d at 1065 (quoting *Lanz v. Resolution Trust Corp.*, 764 F.Supp. 176, 179 (S.D. Fla. 1991)).

"The fact that one party places trust or confidence in the other does not create a confidential relationship in the absence of some recognition, acceptance or undertaking of the duties of a fiduciary on the part of the other party."  *Lanz*, 764 F. Supp. at 179.  Absent certain exceptional instances, a fiduciary relationship does not arise between a debtor and creditor.  *See, e.g.*, *Capital Bank v. MVB, Inc.*, 644

37

So. 2d 515, 518-21 (Fla. 3d DCA 1994) (collecting cases), *rev. denied*, 654 So. 2d 918 (1995); *Barnett Bank of W. Fla. v. Hooper,* 498 So. 2d 923, 925 (Fla. 1986).

### (a)    Escrow Agreement did not trigger any fiduciary duty

Appellants cite the case of *Mahdavieh v. Suntrust Mortgage, Inc.*, 13-32801-CIV, 2014 WL 1365425 (S. D. Fla. Apr. 17, 2014) for the proposition that an escrow agent generally owes a fiduciary duty to the parties to the escrow transaction.    (Initial Brief at 21.)    *Mahdavieh* in turn cites to two state court decisions, including the *Watkins* case cited above, that discuss the principles on which a fiduciary duty can be established.    These principles illustrate exactly what the lower court determined:  it is a fact-specific inquiry, and in light of these facts, no reasonable jury could conclude that a special fiduciary relationship existed between Regions and Appellants.

First, the mere existence of the Escrow Agreement does not create a fiduciary relationship.    As outlined above, the duties of an escrow agent are fully delineated in the escrow agreement and limited to those duties according to Alabama law.    Florida law is the same.    As one court explained in *SO5 501, LLC v. Metro-Dade Title Co.,* 109 So. 3d 1192 (Fla. 3d DCA 2013):

> While "escrow holders have a fiduciary duty to exercise reasonable skill and ordinary diligence," *Watkins v. NCNB Nat'l Bank of Fla., N.A.*, 622 So.2d 1063, 1064 (Fla. 3d DCA 1993), "Florida law has established that parties may limit escrow agents' responsibilities through contract." *Resolution Trust Corp. v. Broad & Cassel, P.A.*,

889 F.Supp. 475, 479 (M.D.Fla.1995); *see also SMP, Ltd. v. Syprett, Meshad, Resnick & Lieb, P.A.*, 584 So.2d 1051, 1054 (Fla. 2d DCA 1991) (noting that "the language of the escrow agreement is the 'primary consideration' in determining the nature and extent of the agency" and that "[o]ther courts have also emphasized that the escrow agent is a special or limited agent with duties primarily established by the escrow agreement").

*Id.* at 1194. Thus, to the extent that Appellants seek to base their claim for breach of fiduciary duty on the escrow relationship, the parties agreed to expressly limit the escrow agent's duties and their claim is subsumed in their breach of contract claim. That claim was properly rejected for reasons discussed above.

### (b) The nature of the banking relationship between Appellants and Regions did not trigger a fiduciary duty

The focus of Appellants' fiduciary duty claim in the lower court was that Villanova played an extensive role in advising and guiding Appellants, who put their trust and confidence in her to essentially manage all their financial affairs. (R. 120, at 17-19.) Those assertions, however, were completely belied by the record.

The lower court began its factual analysis by reviewing the undisputed record of Appellants' background and expertise (supporting record citations are being added in brackets):[10]

---

[10] *See* N.D. Fla. Loc. R. 56.1(A) ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless

First, the undisputed record shows that Meyers worked in commercial real estate development from 1983 to 1991. [R. 121, at ¶4 undisputed.] In 1991, Myers began working as a residential mortgage loan originator and became licensed to perform those services in the State of Maryland. [*Id.*, at ¶5, undisputed.] Kelly worked as a marketing director for a real estate company in 1990. [*Id.*, at ¶6, undisputed.] In 1995, she opened MetFund Mortgage Services (MetFund), a residential mortgage origination business. [*Id.*, at ¶7, undisputed.] Kelly was MetFund's president and sole owner. [*Id.*, undisputed.] Myers worked for MetFund from 1996 to 2008 as its only loan originator, and was executive vice president. [*Id.*, undisputed.] Myers reported to Regions Bank that his income from MetFund in 2006 was $450,000. [*Id.*, undisputed.] In 2006, MetFund applied to do business in Florida as a foreign corporation. [*Id.*, at ¶8, undisputed.] In 2007, MetFund obtained a license from the State of Florida for a mortgage brokerage business. [*Id.,* undisputed.] In 2007, Myers obtained his personal Florida mortgage brokerage license [*Id.,* undisputed.], but MetFund effectively closed at the end of 2007 when business declined as a result of the collapse of the housing market. [*Id.*, at ¶9, undisputed.] From 2006 through 2008, Myers traded securities through Charles Schwab accounts at annual volumes well in excess of $10,000,000. [*Id.*, at ¶13, undisputed.] In 2008, Myers began working as an investment advisor representative himself for Convergent Wealth Advisors, an investment advisory firm whose clients are affluent individuals and families. [*Id.*, at ¶10.]

(R. 173, at 9-10.) The lower court then reviewed the record of interactions between Villanova and the Appellants, correctly concluding that "undisputed facts establish that Appellants' interactions with Villanova are not indicative of a fiduciary relationship":

Plaintiffs bought the Watercolor House in 2002 before meeting Villanova and they did not obtain financing for the purchase through Regions Bank. [R. 120, at ¶14, undisputed.] In January 2004, when

controverted by the statement required to be filed and served by the opposing party.").

40

Plaintiffs signed the purchase and sale agreement for Seaside Lot 6, they had never met Villanova. [*Id.*, at ¶14, undisputed.]  Only after signing the purchase and sale agreement did Meyers initiate contact with Villanova. [*Id.*, at ¶14, undisputed.]  He sent her a letter inquiring about financing for Seaside Lot 6, and he identified Wachovia and SunTrust as competing lenders. [*Id.*, at ¶14, undisputed.]  In June of 2005, Plaintiffs purchased the home in Naples, Florida for $2,300,000. [*Id.*, at ¶16, undisputed.]  Plaintiffs found the property without Villanova's assistance and did not obtain financing through Regions Bank.  [*Id.*, at ¶16.][11]  In February 2006, it was Meyers who initiated the refinancing of Seaside Lot 6 to postpone the balloon payment. [*Id.*, at ¶34, undisputed.]  Plaintiffs later listed the property for sale in June 2007 for $1,995,000, again without Villanova's advice. [*Id.*, at ¶37, undisputed.]    In April 2008, Meyers initiated the second refinancing on Seaside Lot 6, and it was he who suggested the novel cash-out proposal, not Villanova.    [*Id.*, at ¶37, undisputed.][12] Villanova did not advise Meyers regarding his Charles Schwab

---

[11] Regions' Statement of Facts noted that this Naples property was financed by AmSouth Bank (R. 121, at ¶16), which the lower court had previously noted in its order was the predecessor of Regions (R. 173, at 2 n.2). Regions stated that Appellants obtained a second mortgage and line of credit on the Naples home through financial institutions other than Regions.  (R. 121 at ¶17.)  Appellants argued in their Motion to Amend or Alter Judgment (six months after the Summary Judgment ruling was entered) that the lower court erred in finding that Regions did not finance the Naples loan, and suggested this somehow would change the result of the order on summary judgment.  (R. 195 at 8, 20, 22.)  Appellants raise this issue again here.  (Initial Brief at 22.)  As the lower court observed in its order denying this motion, "[a]lthough the Court should have stated that Plaintiffs did not obtain <u>secondary</u> financing on the Naples home through Regions Bank, this clarification does not affect the Court's assessment of the fiduciary duty issue. The key point is that Regions Bank was not exercising extensive control over Plaintiffs' financial affairs and that Plaintiffs in fact sought financing from other institutions." (R. 206, at 2-3.) (emphasis in original.)  Indeed, they received financing from at least <u>six other lenders</u>.  (R. 107-22, at REGIONS 000208.)  Moreover, this argument was not made until long after the summary judgment was entered, and is a classic instance of improperly using Rule 59(e) to litigate new or relitigate irrelevant facts of the case.

[12] Appellants also take issue with this fact, and assert it was an error by the Court. (Initial Brief at 22.)  It was not.  This issue is discussed further below.

accounts or his accounts with other banks. [*Id.*, at ¶28, undisputed.] His wife Kelly never even spoke to Villanova. [*Id.*, at ¶20, undisputed.] Meyers identified only one account on which Villanova was advising him–his private client services account that he opened with an initial deposit of $50,000 in 2004. [R. 107-4, at 78:19-81:3.] In February of 2006, the account balance was approximately $16,000 [R. 107-2, at 149:15-17], and by 2008, the account contained only $585. [*Id.*, at 170:7-171:14.] Meyers has not identified any specific investment advice that Villanova gave him with respect to that account. [*Id.*; R. 121 at ¶28] Moreover, the account was a no-fee account [*Id.*], no different than the accounts Villanoova made available to her 700 other private banking clients. [R. 107-4, at 28:11-14, 78:19-81:3.]

(R. 173, at 10-11.) The lower court correctly determined that "[a] jury evaluating this undisputed evidence could not reasonably conclude that the circumstances were sufficient to give rise to the existence of a fiduciary relationship between Regions Bank and [Appellants]." (R. 173, at 11.) Indeed, Appellants had far more experience in the mortgage brokerage business and other related real estate and financial advisement services than Villanova, who began working while finishing her degree in business administration in 1996. (R. 195-1, at 11:1-24, 13:12-20:7.)

Appellants argue that any facts suggesting that the transaction was out of the norm or involved more work and creativity necessarily means that Regions must have established a fiduciary relationship.[13] The lower court, although it considered

---

[13] They take issue, for instance, with the fact that Regions would only agree to the "cash-out" refinancing to the extent the funds were not released directly to Appellants but were held in an escrow. (Initial Brief at 23.) The reason for Regions' decision to refinance only if the escrow were used is clear from Bloetscher's testimony: "If we had put the funds directly into Mr. Myers'

these factors raised by Appellants (R. 173, at 9), declined the invitation to turn a blind eye to the overwhelming undisputed facts.

### (c)    Particular arguments by Appellants regarding allegedly disputed facts

(i)    Appellants had the opportunity to obtain an appraisal

Appellants argue that "Regions Bank procured the appraisal in conjunction with this financing deal without making sure that the Plaintiffs even reviewed the appraisal." (Initial Brief at 23.) Myers testified, however, that he could have reviewed it but chose not to: "I may have [received the appraisal], but I don't recall looking at it, because I relied on Cynthia [Villanova]." (R. 121, at ¶41.) In any event, this issue is immaterial because the purpose of an appraisal is to protect the lender. *See, e.g., Decatur Ventures, LLC v. Daniel*, 485 F.3d 387, 390 (7th Cir. 2007) ("the idea … that appraisals are designed to help buyers get financing … is fundamentally incompatible with the lender's goal of self-protection"); *see also*

---

checking account, he could have used those funds for anything he desired," instead of repaying Appellants' debt to Regions, through additional funds loaned by Regions, which was the purpose of the refinancing. (R. 107-12, at 76:14-16.) As another Regions employee stated, "People -- typically when they get cash on lots, it's not their primary residence, they walk away from the loan and the bank loses money." (R. 118-4, at 74:4-16.) And the escrow arrangement was not that extraordinary for Regions. As Villanova testified, "I contacted the trust department in Pensacola and said do you know of anything that would work. And they said yes, we have these collateral deposit accounts that are administered by our Mobile office. So I contacted them, and this is what we received." (R. 118-2, at 133:12-17.) This was not a foreign idea; the Trust Department "had heard of [these situations] before." (*Id.*, at 134:4-9.)

*Assad v. Mendell*, 511 So. 2d 682, 684 (Fla. 3d DCA 1987) (holding that borrowers cannot rely on lender's agent).  Appellants conceded they could have obtained their own appraisal.  (R. 121, at ¶39.)

(ii)    Appellants initiated the idea of the cash-out refinance

Appellants also mistakenly argue that the lower court erred in finding no disputed genuine issue of material fact with regard to who came up with the idea for the cash-out refinancing.  (Initial Brief at 22.)

First, even accepting Myers' "dispute" of this fact as "genuine," it still would not lead to a different result in determining whether a jury could find a "fiduciary relationship."  The long list of evidentiary factors enumerated by the lower court described above, including Appellants' extensive experience in real estate and the mortgage business, leave no room to doubt that, even if Appellants could convince a jury that Villanova came up with the idea of the *cash-out* refinancing, this single fact would not overcome the overwhelming context of the non-fiduciary relationship as a whole.

Second, contrary to Appellants' arguments that Villanova came up with the cash-out refinance idea (which they did not raise as a disputed issue until six months after the summary judgment order was entered), the lower court's order indicating that Myers initiated the cash-out refinancing is exactly consistent with the undisputed evidence in the record.

44

The record is undisputed that Myers initiated and proposed the idea of the *cash-out* aspect of the refinancing.   On April 28, 2008, Myers sent a fax to Villanova "requesting a cash-out modification on lot 6/ Seaside 14 for a minimum of $315,000, with the proceeds to be placed in my checking account at Regions." (R. 107-2, at 166:14-167:8; R. 107-3, at MYERS363.)   Appellants have never stated that Villanova initiated the "cash-out" element of the refinance, and never disputed that Myers initiated that idea.[14]   As the lower court correctly concluded, it was Myers who suggested the novel cash-out proposal.

Third, even if this fact would change the result and even if the lower court had gotten it wrong, Appellants could have and should have made the argument long before their Motion to Alter or Amend Judgment.   They did not.   A Rule 59(e) Motion is not the time to re-configure the facts and legal arguments that a party decided not to pursue the first time.   This argument should be rejected on this ground alone.   *Michael Linet, Inc.*, 408 F.3d at 763 (holding that party "cannot use a Rule 59(e) motion to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment.").

---

[14] At most, Myers testified that Villanova suggested lowering Appellants' interest rate, not that she suggested the "cash-out" refinancing.   (R. 107-2, at 165:10-166:10.)

### (d) Appellants' arguments that a fiduciary duty applied to Regions through "investment advisor" regulations which explicitly exclude banks, or for administering the escrow account, must also fail

Appellants also argue that Regions had a fiduciary duty to Appellants because Villanova had certain securities licenses and should be considered an investment advisor while she was investing and managing the Appellants' money. This argument was, once again, not preserved, in addition to the fact that it is both legally and factually incorrect.

First, Appellants initially raised the issue of Villanova's securities licensures in their Motion to Alter or Amend Judgment, almost six months after entry of the Court's Amended Order granting Summary Judgment and seventeen months after the conclusion of briefing on the summary judgment motions. The issue was untimely. *Michael Linet, Inc.*, 408 F.3d at 763.

Second, after arguing that Villanova was acting as an "investment advisor" as defined by federal law, they admit that the law which they are seeking to apply *specifically excludes banks*, such as Regions. 15 U.S.C. § 80b-2(a)(11)(A). They then suggest that the law nonetheless applies to Villanova while she worked on behalf of Regions, even though the regulation expressly exempted her employer. Accordingly, they argue that Regions is liable through *respondeat superior* under a law from which it is expressly exempt. This is simply wrong. Villanova was employed by the bank at all times material hereto, and the bank is exempt.

46

Additionally, Appellants argue that Villanova owed a fiduciary duty because she was administering a fee-based account.  (Initial Brief at 27.)  Here, it is clear that Villanova was not administering the account; she signed the Escrow Agreement on behalf of Regions as the "Secured Party," not as the Escrow Agent. (R. 88-2, at 10.)  Moreover, the only fee involved was an acceptance fee of $500.00 and annual administration fee of $500.00 (R. 88-2 at 13), whereas Villanova made clear that the fees related to investment advisory services – which she did not provide to Appellants – would involve "charg[ing] a fee for managing a portfolio of investments for a percentage."  (R. 195-2, at 120:10-22.)

**D.    The court did not err in finding no genuine issue of material fact regarding the Appellant's FCCPA claim**

**1.    There was no genuine issue of material fact regarding the purpose of the debt**

Appellants next argue in their attempt to avoid financial responsibility that the trial court erred in determining that the Appellants' claims did not fall under the Florida Consumer Collections Practices Act, Section 559.72, Florida Statutes ("FCCPA").  The lower court did not err.  Appellants' claim under the FCCPA must fail for the simple reason that the May 2008 refinancing had no "personal, family or household" purpose.  The "FCCPA appl[ies] only to payment obligations of a (1) *consumer* arising out of a (2) *transaction* in which the money, property, insurance, or services at issue are (3) *primarily for personal, family, or household*

47

*purposes*." *Oppenheim v. I.C. Sys., Inc.*, 627 F.3d 833, 837 (11th Cir. 2010) (emphasis in original). Myers testified that Appellants never obtained plans for a home on Seaside Lot 6 and never used the lot:

> Q:    … Put yourself back in the time where you had the three lots, two in Seaside, one in WaterColor …. Did we ever get to a stage of getting plans drawn up for homes on any of the properties or decision made which one to keep and which to sell, anything of that nature?
>
> A:    No. We never signed a contract with an architect to draw up plans.
>
> Q:    And did you ever make a firm decision of which of those three lots you would like to have a second home on?
>
> A:    No. Everything was moving fairly fast even in the market at that time, and, no, we did not make a firm decision on what our plans were.
>
> Q:    What use has your family made of the lots in Seaside and Water Color since you've acquired them?
>
> A:    I don't know how to answer that question. They're vacant lots.
>
> \*          \*          \*
>
> Q:    Have you done anything other than walk on them, meaning prepare the land, do anything to it?
>
> A:    I can't recall that we did anything to the land.

(R. 107-2, at 104:20-107:1.) Between 2005 and 2009, Appellants did, however, claim rental income and deducted rental expenses on the vacant Seaside Lot 6. (R. 121, at ¶33.) Moreover, Myers admitted that Seaside Lot 6 was listed for sale in 2007 and 2008, including "at the time the loan closed …." (R. 107-2, at 182:22-183:17, 184:24-185:18, 224:10-22.) The fact that Seaside Lot 6 was for sale at the time of the refinancing in May 2008 further refutes any allegation that Appellants

48

intended to "use" the lot for anything other than investment purposes.  And the fact that Appellants had two other "second homes" — in Naples and in Watercolor — makes it incredible that they would even argue that a *vacant lot* had any type of "family" use.  (R. 107-1, at 51:1-10.)

These facts defeat any argument that Appellants planned to use Seaside Lot 6 for "personal, family or household use."  *See, e.g., Samadi v. Bank of Am., N.A.*, No. CV 109–02, 2010 WL 3894448, at *7 n.9 (S.D. Ga. Sept. 30, 2010) (explaining, with respect to similar Truth in Lending Act regulations, that "credit transactions entered into primarily for the benefit of a real estate investment/rental business, … are considered business or commercial in nature, rather  than personal."), *aff'd*, 476 F. App'x. 819 (11th Cir. 2012); *Acciard v. Whitney*, No. 2:07–cv–476–UA–DNF, 2008 WL 5120898, at *9 (M.D. Fla. 2008) (stating that the FCCPA does not apply to mortgages on properties held for investment purposes).

Appellants also argue that Regions' loan documents indicated that the loans were for personal use, but as the lower court properly recognized early in the case, these conclusory statements, whether made by the plaintiffs or the defendant, are insufficient to plausibly allege consumer debt within the meaning of the statute. (S.R. 75, at 5.)[15]

---

[15] This order will be provided as part of a supplement appendix record.

49

### 2. The court's ruling on the FCCPA must also be affirmed because the only alleged communication took place outside of Florida and was not covered by Florida law and any credit reporting communications were preempted by the FCRA

Even if Lot 6 had a personal use that might otherwise qualify under the FCCPA, the lower court's ruling on the FCCPA should still be affirmed on yet another basis. Specifically, there was no evidence or allegation of any communication that was covered under the FCCPA. Regions' Motion for Summary Judgment specifically incorporated by reference the arguments from its motion to strike the Second Amended Complaint's allegations which addressed the FCCPA issue. (R. 106, at 20.) That motion to strike is being included as part of Regions' supplemental record appendix ("S.R.") at 91. This Court may affirm the lower court's decision rendering summary judgment "on any ground supported by the record, regardless of whether that ground was relied upon or even considered by the district court." *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1309 (11th Cir. 2012), *cert. denied*, — U.S. —, 133 S.Ct. 1810, 185 L.Ed.2d 812 (2013).

In its motion to strike, Regions argued that Appellants' Second Amended Complaint, which was the operative pleading on Summary Judgment, relies on an October 30, 2009 "Notice of Breach," attached as Exhibit E to the Second Amended Complaint, sent by Regions in Birmingham, Alabama to Appellants in Bethesda, Maryland. (S.R. 91, at 10.) Under Florida law, that communication is

50

not covered under the FCCPA. *See Ford Motor Credit Co. v. Sheehan*, 373 So. 2d 956, 958 n.2 (Fla. 1st DCA 1979) ("As to that count charging a violation of Section 559.72(7), we conclude the statute has no application since it cannot regulate actions of individuals in Michigan or Rhode Island."). In addition, Regions argued (S.R. 91, at 9) that any alleged credit reporting activities could not form the basis of the FCCPA claim due to preemption by the Fair Credit Reporting Act. *See, e.g., Davidson v. Capital One, N.A.*, No. 14–20478–CIV, 2014 WL 3767677, at *5 (S.D. Fla. 2014). These provide independent bases on which the lower court's ruling should be affirmed with respect to the FCCPA claim. [16]

### E.    The court did not err in awarding Regions its attorneys' fees incurred in recovering on its counterclaim

The Appellants challenge the award of fees as collection costs for Regions' counterclaim and their reasonableness. They do so notwithstanding that they failed to provide a "reasonableness" affidavit as required in the proceedings below and notwithstanding that contrary to the statements in their brief, the lower court plainly reviewed the billing records submitted in support of Regions' fee claim.

The award of fees in this case was made pursuant to Regions' contractual entitlement to collection costs under a $327,200.00 home equity line of credit ("HELOC") which was the subject of its counterclaim. Regions' action to recover

---

[16] The court denied the motion to strike, stating that "the arguments set forth are better addressed through summary judgment proceedings." (S.R. 115.).

on the HELOC began as a state court complaint in Maryland, which was filed only days before Regions was served with the initial complaint in the instant action. As described in Regions' motion for collection of fees below, the Appellants sought to transfer and consolidate the claim into the case now on appeal since the issues were, in their words, "identical." [17]

The pleadings confirm this — Appellants expressly asserted defenses to the Counterclaim which included "excuse for non-performance" due to "Regions Bank's actions, *including without limitation*" breach of the Escrow Agreement; "breach of fiduciary duty"; "impossibility of performance" because of Regions' "unjustified refusal to make the payments" under the Escrow Agreement and HELOC; and "inducing breach of contract … by unjustifiably refusing to make payments" under the Escrow Agreement and HELOC. (R. 102, at 3-4) (emphasis added). Appellants re-asserted those affirmative defenses in opposition to Regions' Motion for Summary Judgment (R. 120, at 7-9), requiring Regions to overcome them accordingly.

---

[17] S.R. 176, at 3. Regions' motion for fees (R. 176) and reasonableness declaration by an outside attorney (R. 177) were not provided in the Appellants' appendix, but will be provided in a supplemental appendix by Regions. The filings related to the case that was transferred from Maryland are not part of the formal record of the case on appeal. Appellants, however, did not oppose any of the description of the background regarding that procedural background in their opposition to the motion. (S.R. 181.)

Under Florida law, full attorneys' fees should be awarded for prevailing on issues interwoven between an affirmative claim and defense of an opposing claim.[18]  This principle is consistent with the well-settled doctrine that where fees cannot be apportioned among different claims, recovery of all the fees incurred is appropriate.[19]

Regions provided detailed time records and supporting declarations regarding the reasonableness of the fees and their necessity.  (S.R. 177, R. 178, 178-1, 178-2, 178-3.)   While Appellants now challenge those fees, they also waived their challenge below by failing to comply with the steps required by the Local Rules to properly do so.[20]   In particular, Appellants failed to "submit an affidavit as to the prevailing hourly rate believed to be more appropriate," pursuant to N.D. Fla. Loc. R. 54.1(E)(4)(b).   The lower court noted this deficiency twice.

---

[18] *See, e.g., Regency Homes of Dade, Inc. v. McMillen*, 689 So. 2d 1204 (Fla. 3d DCA 1997); *Baker v. Falcon Power, Inc.*, 788 So. 2d 1104, 1106 (Fla. 5th DCA 2001).

[19] *Davis v. Locke,* 936 F.2d 1208, 1214 (11th Cir. 1991); *Weitz Co., LLC v. Transp. Ins. Co.*, No. 08-23183-CIV, 2009 WL 5064118, at *4 (S.D. Fla. Dec. 16, 2009); *Pirretti v. Dean Witter Reynolds, Inc.,* 578 So. 2d 474, 475-76 (Fla. 4th DCA 1991); *Caplan v. 1616 East Sunrise Motors, Inc.,* 522 So. 2d 920, 922 (Fla. 3d DCA 1988); *State Farm Fire & Casualty Co. v. Becraft*, 501 So. 2d 1316, 1319 (Fla. 4th DCA 1986); *Heindel v. Southside Chrysler-Plymouth, Inc.*, 476 So. 2d 266, 272 (Fla. 1st DCA 1985); *LaFerney v. Scott Smith Oldsmobile, Inc.*, 410 So. 2d 534 (Fla. 5th DCA 1982).

[20] *See, e.g., Clark v. Hous. Auth. of Alma*, 971 F.2d 723, 728 (11th Cir. 1992) (holding that in determining fee awards, "[b]ecause a district court's interpretation of its own rules should be granted deference, we decline, in the present case, to second-guess the district court's interpretation of its own Rule.").

(R. 187, at 3) (stating that "Plaintiffs object to the reasonableness of the hourly rates charged by Regions Bank's attorneys but did not submit any expert opinion supporting their objection.").

Appellants also erroneously argue that the lower court "did not review the Appellee's actual fee records." (Initial Brief at 49.) That assertion is contrary to two clear statements in the pertinent order which specifically reference the lower court's careful review of the billing records. First, footnote 4 of the order explicitly describes the lower court's review of the "billing records" in order to determine what specific activities Regions was undertaking with respect to the counterclaim and when. (R. 187, at 4 n.4). Second, page 5 of the order states expressly that "the billing records show \$4,082 in attorney time billed prior to August 2012 that is specifically designated as related to the 'Maryland' case or the 'HELOC.'" (R. 187, at 5.)[21] Appellants' arguments and assertions on this issue defy the face of the order.

---

[21] Appellants also point to a single time entry reflecting that an attorney for Regions reviewed other litigation in the Northern District of Florida brought by Appellants involving the Seaside community. (Initial Brief at 50.) Appellants argue that this task can have no possible connection to the Counterclaim. (*Id.*) To the contrary, in order to disprove the affirmative defenses (and affirmative claims) of Appellants, Regions reasonably investigated positions taken in other litigation in which the Appellants were involved, particularly in a case involving the same property development at issue in the instant case.

54

## CONCLUSION

For these reasons, the district court's judgment should be affirmed.

Respectfully submitted,

*/s/  Kevin W. Cox*
PETER P. HARGITAI
Florida Bar No. 85375
E-Mail: peter.hargitai@hklaw.com
HOLLAND & KNIGHT LLP
50 North Laura Street, Suite 3900
Jacksonville, Florida 32202

KEVIN W. COX
Florida Bar No. 34020
E-Mail: kevin.cox@hklaw.com
HOLLAND & KNIGHT LLP
315 South Calhoun Street, Suite 600
Tallahassee, Florida 32301

Attorneys for Appellee Regions Bank

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitation set forth in

FRAP 32(a)(7)(B).  This brief contains 13,664 words.

<u>*/s/  Kevin W. Cox*</u>
Counsel for Appellee

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 3d day of November, 2014, I caused this Brief to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Maurice B. VerStandig
> OFFIT KURMAN, P.A.
> 4800 Montgomery Lane, 9th Floor
> Bethesda, Maryland 20814
> (240) 507-1700

I further certify that on this 3d day of November, 2014, I caused the required number of bound copies of the foregoing Brief of Appellees to be mailed to the Clerk of this Court.

> ***/s/  Kevin W. Cox***
> Counsel for Appellee

#33445341_v11

57